J-S02012-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| TRAVIS HORNSTEIN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| O'LEARY FUNERAL HOME, LTD | : | |
| | : | |
| Appellant | : | No. 1470 EDA 2024 |

Appeal from the Judgment Entered May 3, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180902898

| | | |
|---|---|---|
| TRAVIS HORNSTEIN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| O'LEARY FUNERAL HOME, LTD | : | No. 1623 EDA 2024 |

Appeal from the Judgment Entered May 3, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 180902898

BEFORE: LAZARUS, P.J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED JUNE 17, 2025**

These are cross-appeals[1] from the judgment, entered in the Court of

Common Pleas of Philadelphia County, after a jury returned a verdict in favor

---

[1] On August 8, 2024, this Court issued an order consolidating the cross-appeals, sua sponte, and designating O'Leary as Appellant/Cross-Appellee and Hornstein as Appellee/Cross-Appellant.

of Appellee/Cross-Appellant Travis Hornstein and against Appellant/Cross-Appellee O'Leary Funeral Home ("O'Leary"). After our review, we affirm.

Sometime after 1:00 a.m. on the morning of August 31, 2017, Hornstein's two-month-old son, Jack, died in his crib. Jack's body was transported to Roxborough Memorial Hospital, where Hornstein and Jack's mother, Laura Finsterbusch (collectively, "Parents"), were given the opportunity to hold their deceased son. *See* N.T. Trial, 2/2/24, at 98. Parents were also interviewed by members of the Philadelphia Police Department's Special Victims Unit. *Id.* at 93-94. Jack's body was subsequently transported to the Philadelphia Medical Examiner's Office, where an autopsy revealed that he had died of sudden infant death syndrome ("SIDS").

Hornstein testified that he and Finsterbusch decided they wanted a simple funeral and to be able to dress Jack and place Hornstein's father's mezuzah around his neck. *Id.* at 99. Hornstein testified they "wanted to be able to . . . just have a moment with [their] son. . . . [t]o say goodbye." *Id.* As Hornstein was Jewish, he did not want Jack to be embalmed and he wanted Jack buried within seven days. *Id.* at 100.

Hornstein testified that he deferred to Finsterbusch's wishes in choosing a funeral home and signed a form to release Jack's body to O'Leary. *Id.* at 101-02. Hornstein testified that, after he signed the release, neither he nor Finsterbusch received any phone calls from O'Leary. On September 6, 2017, Parents, along with Hornstein's cousin, Simone, went to O'Leary to discuss arrangements and to drop off a suit for Jack. *Id.* at 104-06. Upon arrival,

they met with William O'Leary ("William"), who did not identify himself at the time.  *Id.* at 106.  Hornstein testified that William was "extremely rude," told "off-putting baseball jokes," looked at his phone, and made "comments about [Hornstein's] lesbian cousin's male haircut."  *Id.*  Hornstein testified that he kept trying to hand Jack's suit to William, but he refused to take it.  *Id.* at 107.  He also refused to take the mezuzah with which Hornstein wished Jack to be buried.  *Id.*  Hornstein asked "four or five times" to view his son's body, but William responded with "blank stares and more off-putting baseball jokes."  *Id.* at 108.  Parents' meeting with William lasted approximately five to ten minutes before Parents "storm[ed] out . . . [b]ecause [they] just weren't getting anywhere.  The guy was blatantly ignoring anything we said.  He was insulting [Hornstein's] cousin."  *Id.* at 109.  Hornstein testified he was scared because he did not know what was happening with Jack's body.  *Id.* at 115.

After leaving O'Leary, Parents went to a cemetery to purchase a burial plot.  *Id.* at 116.  Parents were shown the portion of the cemetery where children were buried, which Hornstein described as "pretty pitiful.  The tree looked like it was dying, overgrown grass, overgrown flat stones on the ground. The plot that . . . I purchased was at the very bottom with half a road collapsed onto it."  *Id.* at 117.  As a result of this experience, Hornstein consulted with his older brother; Parents ultimately decided to bury Jack at West Laurel Hill Cemetery.  *Id.* at 118.

On the morning of the following day, September 7, 2017, Parents returned to O'Leary.  *Id.* at 119.  Hornstein testified that he was "agitated, a

little upset, nervous[,]" and uncomfortable. *Id.* Parents again met with William, who behaved the same way he had the day before and again refused to take Jack's suit and the mezuzah. *Id.* at 119-20. Hornstein again asked to see Jack's body "four or five times. Except this time [he] wasn't asking. [He] was screaming it at [William]." *Id.* at 120. Hornstein's questions again went unanswered. *Id.* At that point, Finsterbusch "was so distraught that she ran to a back door and swung it open." *Id.* The door Finsterbusch opened was to the office belonging to Thomas O'Leary and Thomas O'Leary, Jr. *Id.* at 121. Finsterbusch screamed "give me my son, give me my son," at which point the O'Learys "slammed the door in her face." *Id.* Hornstein then grabbed Finsterbusch by the hand and took her outside, where they encountered funeral director Mary Alice Kelly. *Id.* at 121-22. Finsterbusch gave Jack's suit to Kelly, who took it from her. *Id.* at 122. Hornstein "went to place [the mezuzah] in [Kelly's] hand . . . [a]nd she took it . . . and held it away from her as if it was toxic or poisonous," a response Hornstein interpreted as anti-Semitic. *Id.*

Thereafter, Hornstein instructed his older brother to contact West Laurel Hill and have them immediately send someone to pick up Jack's body from O'Leary. *Id.* at 123. Before leaving O'Leary, Hornstein attempted to retrieve the suit and mezuzah they had given to Kelly. Rather than return the items to Hornstein, Hornstein testified that Kelly "walked into the building and locked herself in her office with the clothes and the mezuzah," at which point

Hornstein called the police. *Id.* at 124. The police spoke with Kelly and, shortly thereafter, Kelly returned the mezuzah to Finsterbusch. *Id.*

Parents proceeded to West Laurel Hill, where they made funeral arrangements with Tom Cavanaugh. *Id.* at 125. Parents asked to have Jack dressed and for the mezuzah to be placed with him. *Id.* at 125-26. They requested an open casket and a grave-side service. *Id.* at 125-26. Parents were given no indication at that time that their requests would not be able to be honored. *Id.* at 126. The funeral service was scheduled for the following Monday, September 11, 2017.

On the day of the funeral, Parents arrived at West Laurel Hill in the early morning, at which point funeral director Andre Ingram took them aside and "began asking [Parents] some very uncomfortable questions," such as whether O'Leary had refrigeration and how long Jack's body had been at O'Leary. *Id.* at 127. Hornstein testified that the questions Ingram asked did not make any sense to him at the time. *Id.* Ingram subsequently informed Hornstein that he would not be able to view his son's body, as Ingram could not open up the body bag "due to the discoloration and smell" of Jack's body. *Id.* at 128. Ultimately, Jack's clothes could only be draped over the plastic bag. *Id.* Ingram was, however, able to place the mezuzah around Jack's neck. *Id.*

Hornstein testified that, prior to Jack's death, "things were looking pretty bright" and "[e]verything was good." *Id.* at 129. He was hopeful about ending his job in the automotive industry and beginning his "promising" new

career in entertainment industry lighting. *Id.* at 129-30. Following his encounter with O'Leary, however, he and Finsterbusch tried to make things work, but they fought "almost every day." *Id.* at 130. Hornstein "had a lot of resentment" toward Finsterbusch, as he blamed her for what happened with O'Leary. *Id.* at 130-31. While they tried making things work, they "never really did." *Id.* at 130. Hornstein testified that he quit doing his lighting work and his "behavior became really erratic after that. [He] stopped trusting a lot of people[ and] started lashing out at a lot of people close to [him]." *Id.* at 132. He ended up quitting his auto body repair job "before [he] could get fired." *Id.* Hornstein testified that, after dealing with O'Leary, life lost its joy and he spent most of his days in bars watching sports. *Id.* at 138. He also began drinking "upwards of about half a bottle of liquor" each day because he was depressed and angry at O'Leary. *Id.* Hornstein testified that, in the period following his interaction with O'Leary, he treated with two psychiatrists and was prescribed medical marijuana, all of which he paid for out-of-pocket. *Id.* at 139-147. Hornstein testified that, while he has made peace with his son's passing, he has not been able to make peace with the fact that he was unable to bury him as he had wished. *Id.*, 2/5/22, at 53.

Christina Tansey, Finsterbusch's sister, testified that it was she who suggested that Parents use O'Leary, as her aunt had used them when her infant child passed away. *Id.* at 60. Tansey contacted O'Leary on Parents' behalf and was told "Okay, we'll take care of it." *Id.* at 61. At Finsterbusch's request, Tansey subsequently visited O'Leary in person and advised them that

the funeral was to be closed-casket and that the family would like to bring clothes for the baby. *Id.* at 63-64. During the five minutes Tansey was at the funeral home, O'Leary never confirmed Tansey's identity, her authority to speak on Parents' behalf, that Parents wished for the funeral to be closed-casket, and did not ask whether Parents wished to view Jack's body. *Id.* at 62-64.

Philadelphia Acting Chief Medical Examiner Lindsay Simon, M.D., testified that Jack's body was received at the M.E.'s office at 8:20 PM on August 31, 2017. *Id.* at 85. She performed Jack's autopsy and concluded that he had died of SIDS. *Id.* at 80. During her examination, there was no evidence of abuse or decomposition. *Id.* at 81. Doctor Simon testified that, when the M.E.'s Office receives a body, they perform a brief examination and then immediately place the body into secure refrigeration until the autopsy is performed to prevent decomposition. *Id.* 81, 86. Other than during the autopsy itself, Jack's body was never out of refrigeration during its time at the M.E.'s office and the temperature of the refrigeration units was always within the acceptable range. *Id.* at 86, 93-94. When Jack's body left the M.E.'s office on September 2, 2017, there were no signs of decomposition. *Id.* at 95.

O'Leary funeral director Mary Alice Kelly was called by Hornstein as on cross-examination. She testified that she has been a licensed funeral director since 1980 and is required to take six hours of continuing education classes every two years to maintain her license. *Id.* at 105. Part of her training

involves bodily decomposition. *Id.* Kelly testified that she never contacted either Hornstein or Finsterbusch and dealt only with Tansey because "we felt that she had the authority to begin arrangements and tell us what to do, so we dealt in good faith with her." *Id.* at 109. Kelly stated she never inquired as to whether Parents would want to view Jack's body prior to burial. *Id.* at 110. Kelly testified that O'Leary had a policy that funeral arrangements for minors were free of charge. *Id.* at 111.

Kelly testified that Jack's funeral was originally scheduled for Friday, September 8, 2017. *Id.* at 116. Although she did not know for sure who sent the driver to pick Jack's body up from the M.E.'s office, she assumed it was William. *Id.* at 117. Kelly testified that Parents were not notified that Jack's body had been picked up from the M.E.'s office and brought to O'Leary. *Id.* at 125. Kelly stated that Jack's body was placed in the preparation room upon arrival at O'Leary. *Id.* The preparation room is kept at a temperature of "probably about 65 degrees." *Id.* at 118. Kelly testified that O'Leary had no refrigeration facilities in 2017, nor did they have any arrangements with another facility to provide refrigeration. *Id.*

Kelly stated that she was aware of a regulation requiring that refrigerated remains be buried within 24 hours and that she knew Jack's body had been refrigerated at the M.E.'s office. *Id.* at 122-23. Despite this, Kelly testified that, after O'Leary picked Jack up, "[they] put him in a sealed casket[,] which would have complied with the . . . funeral director rule." *Id.* at 124. Hornstein's counsel recited the text of 49 Pa. Code § 13.201(6)(ii):

"Human remains kept under refrigeration over 24 hours beyond death shall be maintained at a temperature between 35° and 40°F. The remains shall be buried, cremated[,] or entombed within 5 hours following removal from refrigeration." *Id.* at 136-37. Kelly testified that the regulation "sound[ed] familiar" and stated that O'Leary had failed to comply with its requirements. *Id.* at 137.

Kelly testified that she finally met with Parents on Thursday, September 7, 2017, for about 20 minutes. *Id.* at 119. At that time, she did not discuss their wishes for Jack's service, but Hornstein gave her clothing for Jack, along with the mezuzah. *Id.* at 120. With regard to her reaction to being given the mezuzah, Kelly stated:

> I was surprised because I know what a mezuzah is and my understanding was that it's on the door of a home of a Jewish family. And it was a piece of jewelry. It surprised me, that's all. I knew what a mezuzah was. That was the source of my surprise.

*Id.*

Finsterbusch's deposition testimony was read into the record at trial. She testified that O'Leary had been recommended to Tansey by their Aunt Susie, who had used them "many years before." *Id.* at 161-62. Finsterbusch testified that Tansey had contacted O'Leary to request that Jack be transported from the M.E.'s office to O'Leary. *Id.* at 163. Neither Hornstein nor Finsterbusch ever signed any contract for services with O'Leary. *Id.*, 2/6/24 (Morning Session), at 7-8. Finsterbusch stated that Tansey "was never in charge of" making decisions regarding funeral arrangements. *Id.*, 2/5/24,

- 9 -

at 164. Finsterbusch was "not aware" whether Tansey ever told anyone at O'Leary that the family wanted a closed-casket and graveside burial service. *Id.* O'Leary did not notify Finsterbusch that Jack's body had arrived at their facility. *Id.* at 167. Although she was not clear on the exact date of the meeting, Parents met with William O'Leary at the funeral home, at which time they "verbalized very strongly that [they] wanted an open casket for [their] son. There were a few personal possessions, clothing, different things [they] wanted to put in his coffin and put on him." *Id.* at 173. Finsterbusch testified that William O'Leary informed Parents that "an open casket was absolutely an option" and "whatever [they] wanted [Jack] to wear would be doable." *Id.* at 173-74. She further stated that O'Leary "seemed to not be paying attention" to her and Hornstein and "kept looking at his phone." *Id.* at 174. They eventually asked him to stop, at which point O'Leary looked at them "like he didn't understand why we were upset that he[ was] on his phone." *Id.*

Finsterbusch testified that, at some point after their initial meeting with William, she and Hornstein went to Saints Peter and Paul Cemetery, where they originally planned to bury Jack. *Id.* at 177-78. Like Hornstein, she was dissatisfied with the burial plot's location and decided to bury Jack at West Laurel Hill. *Id.* at 179, 181. A day or two after visiting Saints Peter and Paul Cemetery, Parents went back to O'Leary "to speak to them about how we were going to prepare everything[.]" *Id.* at 183. Finsterbusch testified that, after briefly speaking to William, she and Hornstein were left alone in the lobby for "at least 20 minutes[.]" *Id.* Finsterbusch testified that she and Hornstein

were treated "extremely dismissive[ly.]" ***Id.*** Finsterbusch finally knocked on a door, which was opened by a woman, and "they're all just standing there." ***Id.*** at 185. Finsterbusch asked what was going on, at which point Kelly "shut the door in [her] face." ***Id.*** William finally emerged from behind the closed door and "was kind of acting like he didn't understand what the problem was. He didn't understand why we were upset about what was going on." ***Id.*** At that point, Parents asked if they could see their son. ***Id.*** at 185-86. "An argument ensued, and police were called, and Jack was picked up and removed from O'Leary's." ***Id.*** at 186. Parents then and went to West Laurel Hill. ***Id.***, 2/6/24 (Morning Session), at 7.

At West Laurel Hill, Parents spoke with Ingram and told him that they wanted to have an open casket and that they had clothes in which they wanted to dress Jack. ***Id.*** at 8-9. At the time, Ingram indicated that that "absolutely" would be possible. ***Id.*** at 9. The next time Finsterbusch spoke to Ingram was on the day of Jack's funeral. ***Id.*** After arriving at West Laurel Hill with Jack's clothes, a stuffed animal, and the mezuzah, Ingram took Parents to a room where Parents "believed that [they] were going to see [Jack] and dress him," but "it was just his casket[, which] was closed." ***Id.*** at 11. Finsterbusch testified that Ingram told them that they "should have been able to have an open casket . . . and then when [Ingram] saw the state of [Jack's] body, [] he was appalled." ***Id.*** Ingram advised Parents not to view Jack's body and that "there is no way that he believed [O'Leary] could have properly preserved him due to the state of [the] body." ***Id.*** at 11-12.

- 11 -

Ingram, a licensed funeral director who worked at West Laurel Hill, testified that West Laurel Hill received a call indicating that Parents were dissatisfied with the services they were receiving from O'Leary and wanted to use West Laurel Hill's services. *Id.* at 36. Ingram made arrangements to meet with Parents and personally retrieved Jack's remains from O'Leary. *Id.* at 37. The casket was closed and sealed[2] when Ingram received it. *Id.* at 38. After taking Jack's body to West Laurel Hill, Ingram placed the casket in a refrigerator, kept between 35 and 39 degrees,[3] "to arrest decomposition." *Id.* at 39-40.

Ingram met with Parents, at which time they informed him of their wishes. Ingram testified that it was important to Parents that they get an opportunity to view and say goodbye to their son. *Id.* at 41. However, prior to the date of the service, Ingram examined Jack's body and discovered that it was "in terrible shape." *Id.* at 51. Specifically, Ingram testified:

> The baby had recessed eyes, meaning the eyes were sunk well back into the cranium or the orbit. Skin slip. Again, a top layer of skin was literally peeling off or falling off. There was a horrendous smell. And the various colors of the body: greens, and dark red, dark purplish colors.

*Id.* at 56. As a result of the body's condition, Parents were only able to spend time in the same room as Jack's casket and were unable to interact with his

_____

[2] Ingram testified that there is epoxy inside a casket lid covered in wax paper. *Id.* at 38-39. When the wax paper is removed and the lid is pressed down, it is sealed. *Id.* at 39.

[3] Ingram testified that the industry standard for refrigeration is between 35 and 40 degrees. *Id.* at 40.

body in any way. *Id.* at 57. Ingram, himself, placed the mezuzah in the casket and placed Jack's clothing on top of the body bag. *Id.* at 57-58.

Licensed funeral director Sabrina Ricks[4] testified that, when she receives a body at her funeral home, she immediately places it in refrigeration at a temperature of 35 to 40 degrees. *Id.* at 34, 35. She stated that the refrigeration system has an "alarm threshold," meaning that if the temperature goes above 42 degrees or below 33 or 34 degrees, an alarm sounds. *Id.* at 34-35. Ricks testified that it was the industry standard to contact the family "immediately upon arrival of th[e] body to [a] facility . . . to figure out what the next steps are or gather the rest of the information." *Id.* at 38. Ricks stated that a funeral home who "ask[s] for [the family] to contact us[ because] we can't be chasing people"[5] would not be in compliance with industry standards. *Id.* Ricks testified that, when dealing with a deceased child, arrangements are to be made with the child's "legal next of kin," i.e., parents, not an aunt. *Id.* at 40. Ricks testified that if a non-parent came to her facility, she would check their ID and would only work with that

---

[4] Ricks testified on Hornstein's behalf as an expert in funeral directing and "the standards and procedure[s] and the process of refrigerat[ion], why a person is refrigerated[.]" *Id.*, 2/6/24 (Afternoon Session), at 28.

[5] In deposition testimony read into the record, Thomas O'Leary, William's brother and an owner of, and the registered supervisor funeral director at, O'Leary, testified that, if an aunt of a deceased child contacted O'Leary to engage its services, O'Leary would not contact the parents but, rather, "[w]e ask for them to contact us. We wouldn't be chasing people." *Id.*, 2/7/24, at 134.

person if they presented documentation that they were the legal guardian or next of kin, or if the parents waived their rights in writing. *Id.* at 40, 41.

Ricks testified that it would be inappropriate for a funeral home to pick up refrigerated remains before making arrangements with a family if the facility did not have refrigeration facilities. *Id.* at 43. Ricks testified:

> Upon arrival at the funeral home, any remains are placed under refrigeration until arrangements are made. After arrangements are made, when we remove the body from refrigeration, we execute the plan, whether it be burial, cremation, embalming, we execute from there, we don't remove the body from refrigeration until there is a plan.

*Id.* at 51. Ricks testified that removing a body from refrigeration and storing it at room temperature—even in a sealed casket—for more than a week does not comply with the regulations because the body will decompose. *Id.* Ricks testified that where a body has been refrigerated for more than 24 hours and then removed from refrigeration for more than five hours, placing the body in a sealed casket does not comply with the Pennsylvania regulations. *Id.* at 77-78. Rather, a body must either be cremated, entombed, or buried within 5 hours of being removed from refrigeration. *Id.* at 78. Ricks testified that, if a parent wished to view the body of his properly preserved child, she would have no problem complying with that request. *Id.* at 32. However, if a child's body had decomposed while in the care of a funeral home, Ricks testified that it would be a funeral director's responsibility to inform a parent as to why he could not view his child's body. *Id.* at 32-33.

Finally, Ricks reviewed the documentation provided to Parents by O'Leary and testified that it did not comply with Pennsylvania regulations. *Id.* at 46-48. Ricks testified that, even if services were being provided free of charge, a list of services would "for sure" be drawn up "to have a record of it." *Id.* at 69.

Hornstein called Colleen O'Leary Fagioli as O'Leary's corporate representative as on cross-examination. Fagioli testified that O'Leary did not have refrigeration in August 2017 but had access to refrigeration at her sister's crematory in Yeadon "[i]f we needed to." *Id.* at 86. Fagioli testified she was unaware whether anyone from O'Leary reached out to her sister to see if Jack's body could be stored there. *Id.* at 87. She did not know whether formal arrangements had been made with Parents at the time O'Leary picked Jack's body up from the M.E.'s office. *Id.* at 89.

John Williams, M.D., testified on Hornstein's behalf as an expert in psychiatry. Doctor Williams examined Hornstein in May 2020 and performed the Beck Depression Inventory, the Brown Adult Attention Deficit Disorder ("ADD") Scale, the clinician-administered post-traumatic stress disorder ("PTSD") scale for DSM-5, and the Minnesota Multiphasic Personality Inventory. *Id.*, 2/7/24, at 15-17. Doctor Williams also reviewed the M.E.'s records pertaining to Jack's death, records from Hornstein's mental health providers, and the complaint, answer, and answers to interrogatories from the civil action. *Id.* at 17-18. Doctor Williams concluded that Hornstein suffered from "significant" anxiety and depression, chronic PTSD, and ADHD. *Id.* at

- 15 -

19-20. Doctor Williams testified that Hornstein's PTSD was "the direct result" of his dealings with O'Leary and that his depression and anxiety had been "exacerbate[d]" by those dealings. *Id.* at 30. Doctor Williams recommended that Hornstein required ongoing weekly psychiatric and psychotherapeutic treatment, including cognitive behavioral therapy ("CBT"), for "at least five years to deal with his very significant psychopathology." *Id.* at 31. Given the severity of Hornstein's presentation, Dr. Williams opined that "successful treatment may take as many as ten years." *Id.* at 32.

Varsha Desai, R.N., testified as an expert in the area of life care planning, medical cost review, and medical cost projection. *Id.* at 58. After interviewing Hornstein and reviewing the cost of Hornstein's projected medical treatment as set forth in Dr. Williams' report, as well as Hornstein's mental health treatment billing records, Desai prepared a life care plan for Hornstein. *Id.* at 59-60. Desai projected that Hornstein's psychiatric treatment would cost $14,560.00 for 5 years and $72,800.00 for ten years. Desai projected costs associated with CBT would range from $32,500.00 for 5 years to $65,000.00 for ten years. She also estimated a lifetime cost for medical marijuana treatment in the amount of $220,800.00.

The defense read into the record portions of Thomas' deposition testimony. Thomas testified that if the sibling of a parent contacted O'Leary, he would "assume that they were asked by the family to call" and would accept the sibling's word that they were authorized by the parents. *Id.* at 131-32. Thomas testified that O'Leary would not then contact the Parents but "ask for

them to contact us. We wouldn't be chasing people." *Id.* at 134. Thomas testified that O'Leary does not maintain a copy of the Pennsylvania funeral director regulations in its office. *Id.* at 134-35. He further stated that, in August/September 2017, O'Leary did not have on-premises refrigeration but had access to it through his daughter's crematory in Yeadon. *Id.* at 136-37.

The defense read into the record excerpts from William's deposition. William was an owner and licensed funeral director at O'Leary. *Id.* at 154-55. William testified that, when his brother Thomas was not working, he was responsible for the supervision of the funeral home. *Id.* at 166. William stated that he did not know Hornstein, Finsterbusch, or Jack and did not have any knowledge of the events surrounding this case. *Id.* at 169-70. He testified that O'Leary had no standard operating procedures or protocols and that he "ha[d] no idea" how complaints about services would be handled. *Id.* at 172. William testified that he "really wouldn't know" if there was any regulation or statute that governs who has the authority to make burial decisions for a deceased child. *Id.* at 181-82. He stated that there had been "many times" when O'Leary had picked up the body of a decedent prior to the family making decisions about arrangements even if the body had previously been under refrigeration. *Id.* at 187-88. William testified that "anybody from the family" can sign a release enabling O'Leary to retrieve a body from the M.E.'s office. *Id.* at 192.

William testified he did not know whether there were any statutes or regulations governing the retention of documentation such as a funeral

contract. *Id.* at 195-96. William stated that it was not O'Leary's normal practice to fully complete funeral arrangement forms. *Id.*, 2/8/24, at 9. William testified that he did not know whether Kelly confirmed what Parents wanted done with Jack's remains. *Id.*, 2/7/24, at 199-200. William did not know who made the decision to pick Jack's body up from the M.E.'s office. *Id.* at 203-04. William testified that he "guarantee[ed]" Jack's body was not refrigerated after it was picked up from the M.E.'s office and that O'Leary did not have access to another facility with refrigeration. *Id.*, 2/8/24, at 16-19. He testified that he never saw or spoke with Parents in the funeral home but saw them in the parking lot. *Id.* at 22, 29. After being shown a police report with his name and phone number on it, William did not know why he was named in the report. *Id.* at 29. William also testified that he did know about the regulations pertaining to refrigerated bodies and their disposition. *Id.* at 36. He also testified that "it could be two or three days" when asked how long a funeral director had to bury, cremate, or entomb a body after its removal from refrigeration. *Id.* at 37. William testified that O'Leary's morgue was kept at approximately 60 degrees using air conditioning. *Id.* at 45-46.

Robin Altman, M.D., testified for O'Leary as an expert in psychiatry and general medicine. Doctor Altman reviewed Dr. Williams' report, as well as the records of Hornstein's mental health providers and the life care plan drafted by Varshi Dasai. After interviewing Hornstein and reviewing the aforementioned documentation, Dr. Altman diagnosed Hornstein with paranoid personality disorder. *Id.* at 94. She did not see any symptoms of

PTSD. *Id.* Doctor Altman described an individual with paranoid personality disorder as someone who

> perceive[s] everything as an insult, or they don't trust other people, they're very suspicious of people's motives, they overreact to benign circumstances and they interpret them as attacking them or putting them down. They hold grudges forever and they ruminate over what has been—who has wronged them and what has been done to them. Again, they see hidden, threatening, or demeaning messages [in] benign remarks or action[s].

*Id.* at 95. Doctor Altman testified that Hornstein "wasn't thinking about the death of his son so much as thinking about how angry he was at the funeral home for what he perceived as purposeful meanness regarding . . . preparing his son, just how [O'Leary] handled the whole situation." *Id.* at 97. Doctor Altman testified that, while Hornstein suffered from paranoid personality disorder prior to Jack's death, the circumstances surrounding the death "brought out his paranoia, so he began to be even more angry at perceived injustices." *Id.* at 99. Doctor Altman testified that what happened to Hornstein at O'Leary "made him very, very angry and paranoid" and he suffered mental distress because of it. *Id.* at 108-09. Doctor Altman testified that the use of medical marijuana would be contraindicated for both PTSD and paranoid personality disorder and would be contraindicated in Hornstein's case. *Id.* at 100-01.

Richard Thomas Callahan testified for O'Leary as an expert in funeral services, death care, and funeral directing. *Id.* at 135. Callahan reviewed, inter alia, the deposition transcripts of Tansey, Finsterbusch, Hornstein, William O'Leary, Thomas Cavanaugh, and Fagioli, the complaint, records from

West Laurel Hill, Ricks' expert report, and records from the M.E.'s office. *Id.* at 140-41. On direct examination, Callahan testified that placing Jack in a sealed casket after having been refrigerated for more than 36 hours would have been "proper protocol." *Id.* at 147.

On cross-examination, Callahan testified that Pennsylvania licensed funeral directors would be aware of issues surrounding decomposition. *Id.* at 149. Callahan testified that showing parents the unembalmed, autopsied remains of a child is "an ab[]omina[b]l[e] practice." *Id.* at 152-53. Callahan testified that it is not uncommon in the case of deceased children for other family members to step in, "at least for initial contact to get things rolling[.]" *Id.* at 154. Callahan testified that someone from O'Leary should "probably" have called Parents. *Id.* at 156.

Finally, Kimberly Kushner, a certified life care planner, testified for O'Leary as an expert in life care planning. She reviewed Hornstein's mental health and related billing records, the depositions taken in the case, Dr. Williams' report, Dr. Altman's report, and Desai's life care plan. *Id.* at 165. Kushner testified that Hornstein has a "longstanding history of psychiatric and psychological care that predated the death of his son." *Id.* at 169. She testified that Hornstein had seen mental health providers for many issues, including Jack's death and the aftermath of what occurred at O'Leary. *Id.* at 170. Thus, in preparing her life care plan for this case, it was necessary for Kushner to parse the care that Hornstein needed generally from that which was necessary specifically as a result of his experience with O'Leary. In doing

so, Kushner concluded that "there is not enough evidence to suggest from the medical records that the need for psychiatric and psychological therapy and care [] was specific to those events that occurred at [O'Leary]." *Id.* at 171. Kushner testified that "it was not clear" why Desai included medical marijuana in her life care plan for Hornstein, given that no treatment provider had ever prescribed or recommended it. *Id.* at 172. Thus, Kushner opined, Hornstein's life care plan should not include funds for a lifetime supply of medical marijuana. *Id.* at 178. Kushner also opined that zero dollars should be allocated to psychological and psychiatric care, as Hornstein has a longstanding history of mental health issues that would require treatment regardless of whether the events at O'Leary had ever occurred. *Id.* at 178-79.

Following deliberations, the jury returned a verdict in favor of Hornstein in the total amount of $459,350.00, which included $300,000.00 in punitive damages. Both parties filed post-trial motions. On April 29, 2024, the trial court denied O'Leary's motion, granted Hornstein's, in part, and entered judgment in favor of Hornstein in the amount of $449,789.00.[6] O'Leary filed a timely notice of appeal and Hornstein cross-appealed. Both parties and the court have complied with Pa.R.A.P. 1925.

O'Leary raises the following questions for our review:

_____

[6] The jury found Hornstein 6% contributorily negligent and, thus, the jury's compensatory award was reduced from $159,350.00 to $149,789.00.

- 21 -

> 1. Whether the trial court abused its discretion in instructing the jury on punitive damages where there was no evidence that would suggest that any of O'Leary's actions or omissions were "outrageous" in nature.
>
> 2. Whether the trial court abused its discretion in instructing the jury on the issue of crimen falsi, as Hornstein did not provide any legal authority that would allow the trial court to reframe the deposition testimony of William O'Leary, who at the time of his deposition was not convicted of any crimen falsi crimes.

Brief of Appellant, at 4 (reworded for clarity).

O'Leary first asserts that the trial court erred in denying its motion for judgment notwithstanding the verdict ("JNOV") with respect to punitive damages. O'Leary argues that the evidence at trial did "not warrant instructions on punitive damages, as there was no evidence . . . that [O'Leary's] actions or omissions were 'outrageous.'" Brief of Appellant, at 14. O'Leary argues that, because the jury did not find evidence of intentional infliction of emotional distress—"which has, as part of its elements, 'outrageous' conduct," *id.* at 17—it was an abuse of discretion to not strike the award of punitive damages.

O'Leary further argues that the award of punitive damages is "unconstitutionally excessive and disproportionate . . . and[,] thus, violates the Due Process Clause of the Fourteenth Amendment and the Due Process Clauses of the [Pennsylvania constitution]." *Id.*, citing *Pestco, Inc. v. Associated Prod., Inc.*, 880 A.2d 700, 710 (Pa. Super. 2005). Noting that punitive damages are an "extreme remedy" available only in "the most exceptional matters," O'Leary asserts that the facts of this case "did not rise

to the level of a 'most exceptional' case." Brief of Appellant, at 17, 19. O'Leary

is entitled to no relief.

> Our case law makes it clear that punitive damages are an "extreme remedy" available in only the most exceptional matters. *See Martin v. Johns–Manville Corp.*, [] 494 A.2d 1088, 1098 n.14. (Pa. 1985)[.] Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either "the defendant's evil motive or his reckless indifference to the rights of others." [*Id.*] at 1096; *see also Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) (finding [] punitive damages may be appropriately awarded only when [] plaintiff has established [] defendant has acted in [] fashion "so outrageous as to demonstrate willful, wanton or reckless conduct"). A defendant acts recklessly when "his conduct creates an unreasonable risk of physical harm to another [and] such risk is substantially greater than that which is necessary to make his conduct negligent." *Id.* at 771 (citation omitted). Thus, a showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed. *SHV Coal, Inc. v. Continental Grain Co.*, [] 587 A.2d 702, 705 ([Pa.] 1991). Rather, the plaintiff must adduce evidence which goes beyond a showing of negligence, evidence sufficient to establish that the defendant's acts amounted to "intentional, willful, wanton or reckless conduct[.]" *Id.* at 704 (citation omitted).

*Phillips v. Cricket Lighters*, 883 A.2d 439, 445–46 (Pa. 2005) (footnote

omitted). A "plaintiff in a case sounding in negligence [may undertake] the

additional burden of attempting to prove, as a matter of damages, that the

defendant's conduct not only was negligent but that the conduct was also

outrageous[] and warrants a response in the form of punitive damages."

*Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 772 (Pa. 2005).

The trial court addressed O'Leary's claim as follows:

> [The evidence] detail[ed] how [O'Leary's] conduct allowed the remains of [Hornstein's] infant son to decompose due to being kept in a space where the temperature of the facility was inadequate, the facility had no refrigeration, and such conduct went against regulations. Instructing the jury on punitive damages was not an abuse of discretion because there was sufficient evidence presented that [O'Leary], a funeral home that deals with corpses in the normal course of operation, had a subjective appreciation of the risks concerning inadequate temperature and lack of refrigeration in connection with regulations and decomposition, and [O'Leary's] conduct in allowing [Hornstein's] child's body to decompose was in conscious disregard to such risks.

Trial Court Opinion, 7/25/24, at 32-33.

We agree with the trial court that the evidence adduced at trial supported a jury instruction on punitive damages. O'Leary, knowing that it lacked refrigeration facilities on its premises, removed Jack's body from the refrigeration unit at the M.E.'s office before it had any idea as to Parents' wishes regarding the disposition of Jack's remains. Having removed Jack's body from refrigeration, O'Leary was required by regulation to bury, cremate, or entomb the remains within five hours. *See* 49 Pa. Code § 13.201(6)(ii). Instead, O'Leary allowed the remains to sit for more than one week in a 65-degree room, which caused the body to decompose significantly faster than it would have had it been properly refrigerated. O'Leary did this despite the fact that it had access to refrigeration facilities at the crematorium owned by Thomas's daughter. Although O'Leary assured Jack's grieving parents that they would be allowed to see and spend time with their child, O'Leary repeatedly refused such requests with no explanation. Finally, Parents were subjected to bizarre and disrespectful treatment, particularly at the hands of

William, who continually looked at his phone, told off-putting jokes, and insulted Hornstein's cousin based on her appearance. In its totality, a jury could reasonably conclude that the conduct of O'Leary and its representatives was outrageous and the result of "reckless indifference to the rights of others." **Phillips**, **supra**. As such, O'Leary is entitled to no relief.

O'Leary's second and final claim is that the trial court erred in providing a crimen falsi jury instruction regarding William. William's deposition was taken on July 30, 2020. Prior thereto, he had been indicted on certain criminal charges. After his deposition, but before trial, William entered a guilty plea to deceptive business practices. As a result, Hornstein sought, and received, a crimen falsi jury instruction with regard to William's deposition designations that were read into the record at trial. O'Leary argues that, because at the time of his deposition, William "had not been arraigned, much less convicted [of] or pled guilty [to], any crimen falsi crimes[,]" a crimen falsi instruction was inappropriate. Brief of Appellant, at 21.

Preliminarily, we note that both the trial court and Hornstein assert that O'Leary has waived this claim because, "[a]fter initially raising an objection, [O'Leary] agreed to the wording of the instruction that was delivered to the jury" and did not renew its objection. Brief of Appellee, at 23. They are incorrect. During a discussion of the issue outside the presence of the jury, the court stated the following:

> THE COURT: Well, counsel for the defense—I mean, **I know you're objecting**. **I'm not taking away your objection**, but if I rule that it does come in, it should come in by way of stipulation.

I mean, normally, if it comes in, both counsel come up with a stipulation and you try to make it so it's not—you know, you tailor it to a stipulation and the jury instruction—that's why I wanted both of you to talk, if I admit it, [about] how the jury instruction should be read.

N.T. Trial, 2/8/24, at 56. Ultimately, the trial court ruled that it would allow evidence of William's crimen falsi guilty plea to be presented to the jury and gave counsel an opportunity to consult as to the form the stipulation would take. After counsel reached an agreement on the wording of the stipulation, the court again acknowledged that O'Leary's objection was preserved:

THE COURT: ["]There has been a stipulation that William O'Leary ple[]d guilty involving a crime of dishonesty and Mr. O'Leary ple[]d guilty in 2023["]; is that the stipulation that both counsel agree to?

[HORNSTEIN'S COUNSEL]: We agree to that.

THE COURT: Defense[?]

[O'LEARY'S COUNSEL]: Yes, Your Honor.

THE COURT: **Once again, I'm not waiving your objection**, but based on my ruling[,] that's following the law of the crimen [] falsi and it's not prejudicial, so I think that's a good stipulation.

*Id.* at 63-64. Based on the foregoing, it is clear that O'Leary did not waive its objection to the admission of crimen falsi evidence at the time of trial. *See* Pa.R.E. 103 (party may claim error in ruling to admit or exclude evidence where party makes timely objection and states specific ground; once court rules definitively on record either before or at trial, party need not renew objection to preserve claim of error for appeal).

Although O'Leary preserved this claim at trial, we are nonetheless constrained to find waiver for O'Leary's subsequent failure to sufficiently

develop the issue in its appellate brief. As a general rule, an appellant "shall have at the head of each part [of his argument] . . . the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). "Arguments not appropriately developed are waived." *Commonwealth v. Love*, 896 A.2d 1276, 1287 (Pa. Super. 2006) (citation omitted). "It is not the duty of the Superior Court to act as an appellant's counsel, and it is an appellant's responsibility to establish both the purported errors and any entitlement to relief therefrom." *Id.* (citation omitted). Indeed, appellate courts are "neither obliged, nor even particularly equipped, to develop an argument for a party. To do so places the Court in the conflicting roles of advocate and neutral arbiter. The Court is left to guess at the actual complaint that is intended by the party." *Commonwealth v. Williams*, 782 A.2d 517, 532 (Pa. 2001) (Castille, J., concurring).

Here, O'Leary devotes the bulk of its argument on this claim to demonstrating that it did not waive the claim at trial. *See* Brief of Appellant, at 22-23. O'Leary's "argument" on the substance of the issue consists of a single conclusory statement, unsupported by citation to any case law whatsoever, that "[t]he crimen falsi instruction to the jury so poisoned the [j]ury pool that it is likely the [j]ury factored into its findings this information in [its] award of punitive damages." *Id.* at 23. Because O'Leary has failed to develop this claim in a manner capable of appellate review, it is waived. *Love*, *supra*. *See also Samuel-Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 29 (Pa. 2011) (litigant's "failure to develop the claim in any meaningful

- 27 -

fashion . . . so as to allow for appellate review [is] a sufficient basis in itself to reject the argument") (citation omitted).

We now turn to the claims raised by Hornstein on cross-appeal, which are as follows:

> 1.  Did the trial court commit reversible error in determining that [Pennsylvania's] Unfair Trade Practices and Consumer Protection [Law ("UTPCPL")] did not apply because payment was not issued?
>
> 2.  Did the trial court commit reversible error requiring the remedy of additur?

Brief of Cross-Appellant, at 7 (unnecessary capitalization omitted).[7]

Hornstein first claims that the trial court erred by granting O'Leary's motion in limine and precluding Hornstein from pursuing a claim under the UTPCPL because, according to the trial court, "there was no evidence [showing that Hornstein] purchased or leased goods or services from [O'Leary], which is necessary under the [UTPCPL]." Trial Court Opinion, 7/25/24, at 47. Hornstein argues that "[t]he precedents support a definition of [`]consumer['] that focuses on the receipt of goods and services and a liberal construction of the statute." Brief of Cross-Appellant, at 27. Hornstein claims that "[a]dopting [O'Leary's] position would create an artificial payment requirement[,] thereby resulting in a giant loophole in the statutory scheme which was designed to protect consumers" and would "overlook the deterrence function envisioned by the legislature by allowing unscrupulous entities to

---

[7] Hornstein presented two other claims that were merely restatements of O'Leary's appellate claims, which we have already addressed.

insulate themselves from liability by not charging for defective goods and services after the fact." *Id.* at 28. Hornstein is entitled to no relief.

Hornstein's claim involves statutory interpretation and our scope and standard of review is well-settled:

> [I]ssues involv[ing] statutory interpretation[] raise a question of law, and are subject to de novo and plenary review. Generally, with respect to statutes, the object of all interpretation and construction is to ascertain and effectuate the intention of the General Assembly. Because the legislature is presumed to have intended to avoid mere surplusage, every word, sentence, and provision of a statute must be given effect. Where words of a later statute differ from those of a previous one on the same subject, they presumably are intended to have a different construction. We may also assume the legislature does not intend a result that is absurd, unreasonable, or impossible of execution.

***Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC***, 40 A.3d 145, 151 (Pa. Super. 2012) (internal citations and quotations omitted).

The UTPCPL provides for a private cause of action as follows:

> (a) **Any person who** purchases or leases goods or services primarily for personal, family[,] or household purposes and thereby **suffers any ascertainable loss of money or property**, real or personal, as a result of the use or employment by any person of a method, act[,] or practice declared unlawful by section 3 of this act, **may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater**. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 P.S. § 201-9.2(a) (emphasis added). "The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the

defendant's prohibited action." ***Weinberg v. Sun Co., Inc.***, 777 A.2d 442, 446 (Pa. 2001).

Here, Hornstein alleges in the UTPCPL count of his complaint that he sustained damages as follows: "severe emotional distress, mental distress, depression, nightmares, insomnia, flashbacks, anxiety, humiliation, loss of life's pleasures, mental anguish, grief, rage, pain, and suffering." Complaint, 9/21/18, at ¶ 92. None of these damages constitute an "ascertainable loss of money or property" and, as such, are not cognizable under the UTPCPL. 73 P.S. § 201-9.2(a); ***see Weinberg***, ***supra***. Accordingly, the trial court properly dismissed Hornstein's claim under the UTPCPL.

Finaly, Hornstein claims that the trial court "committed multiple evidentiary errors requiring the remedy of additur." Brief of Cross-Appellant, at 29. Specifically, Hornstein asserts that the court erred in excluding the following evidence: (1) photographs of Jack's decomposed body; (2) evidence of William's "long and obnoxious disciplinary history with the Board of Funeral Directors;" (3) the fact that O'Leary "was earning more than a million dollars a year" at the time of the incident; (4) the fact of Finsterbusch's death; (5) Hornstein's "treatment following 2020, which allowed [O'Leary] to make a statement at closing [that Hornstein] had no treatment since 2020;" and (6) Hornstein's requested instruction on intentional infliction of emotional distress. Brief of Cross-Appellant, at 29-31. Hornstein alleges that the omission of this evidence, and the requested instruction, "unfairly reduced the amount of compensatory and punitive damages awarded by the jury" and

require the remedy of additur. *Id.* at 31; *see id.* at 29. Hornstein is entitled to no relief.

As noted above, "[a]rguments not appropriately developed are waived." *Love*, 896 A.2d at 1287. In briefing his claim, Hornstein cites to: (1) Pa.R.C.P. 227.1 for the proposition that "courts have the inherent authority to enter any appropriate order" and (2) two cases setting forth our standard of review. Brief of Cross-Appellant, at 29. The remainder of the "argument" on this claim consists merely of a recitation of the court's purportedly erroneous evidentiary rulings. Hornstein fails to develop any legal argument and cites no case law whatsoever.

When an appellant fails to develop his issue in an argument and fails to cite any legal authority, the issue is waived. *Commonwealth v. Luktisch*, 680 A.2d 877, 879 n.1 (Pa. Super. 1996). "[M]ere issue spotting without analysis or legal citation to support an assertion precludes our appellate review of a matter." *In re J.B.*, 39 A.3d 421, 437 (Pa. Super. 2012) (citation omitted). Because Hornstein fails to develop his argument in any meaningful way, his final claim is waived.

Judgment affirmed.

McLaughlin, J., Did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/17/2025